Our third case for this morning is McCoy v. Chicago Heights Election Commission. Mr. Jackson. Good morning Your Honor. May it please the court, George Jackson on behalf of the plaintiffs in this case. Your Honor, I'll refer to the residents by simple terms, black, white, and Hispanic. While there may be other more apropos political terms I can use, I'll stick with that simplicity. You always have to be careful. Thank you judge. And I want to start with the raw numbers. This is litigation that's been going on for a long time and I will submit to the court that one of the reasons that has been going on for a long time is that there is no liquidated damage provision. There is nothing to encourage the defendants in this case to comport with the consent decree or any other orders that have been entered by the judges. I don't quite understand that since of course if a consent decree is in place, it's routine for people to come back to the court. The court normally retains jurisdiction over it and if something's not being complied with, equitable relief is possible. That's true judge, that's true. Which requires the offended party to now take an additional step as opposed to the court having on its own a liquidated provision. Well, that's pretty normal though. I mean we have a party driven system of advocacy in our country and yes, I don't disagree with you that it thinks there's a problem to go back and tell the court. For the court to set in advance some sort of, I mean I can't even imagine a liquidated damage provision in a voting rights case, but maybe there could be. I don't know. It seems odd. Be that as a major, Your Honor, the point simply being that there has to be some degree to encourage them to follow and someone let them. And the fact that the court has is something. What I am interested in is where did the district court here go wrong in saying that even though these districts aren't, you know, down to the last household districts that reflect the various groups in Chicago here, the deviation isn't that big. It's 12 point something percent and the court realizes that that's beyond the safe harbor. It's beyond the 10% that the Supreme Court has looked at, but it's considered how the maps were drawn. There's geographic contiguity to the new maps. Populations are shifting. Anyway, the let me start where I initially started to start, which is just the raw numbers. The court, first off, in response directly to your question, misinterpreted the consent degree itself. The consent degree was clear, and I'm sorry for using that term. I hate to use that term because we're in litigation, so obviously it's not all clear. No, it's not clear because there's some parts of the consent decree that look like this is something to be done by the city, and there are some parts of the look as though it's all the parties to the consent decree. Well, that is if one reads the consent decree in individual portions. If you read an individual line of a paragraph, well, you can come up with different interpretations of what that individual line means, but if you read that individual line in conjunction with the paragraph itself, there's less ambiguity. Indeed, there's no ambiguity, particularly with this case. On page 22 of the consent decree, it sets forth that this is what's going to happen. I'm using layman's terms here now. This is what's going to happen. If there is an election in 2011, we've agreed upon what the warrants will be, what the boundaries will be. That's going to be contained in Exhibit B and Exhibit C of this on the boundaries as we've already agreed to. Here's the map. I understand. After that election, the city shall reapportion consistent with what we've agreed upon, and that's the portion that I'm talking about. It didn't leave any wiggle room for the city. It said, we've agreed upon this. This has been 20-something, almost 30 years of litigation. We've reduced this down to this agreement. These are the boundaries, Exhibit B, Exhibit C. You shall implement, you shall reapportion consistent with these agreed-upon boundaries. That's what they were supposed to do, and this is where I get back to my notion of the liquidated damages provision, but there is no incentive for them to do that. Instead, you just ignore it, which is what they did. They simply ignored it. They did not implement consistent with the consent decree. Now, what they did instead, and this is where I say it was the sleight of hand, legal permissive sleight of hand, but it was one of advocacy, where they persuaded the judge, who was not the judge that instituted and signed the consent decree, but a new judge who's coming on board. There have been numerous judges in this case. It's been going on forever, right? It has been going on for a century. It's been going on for a long time. It's been going on for a long time. And you have now another judge who's not a party to, excuse me, not a party, but was not a part of all of the machinations and the arguments and the back-and-forth to reach the contents of the consent decree, and he's made to believe that the operative language is found on page 25. He's made to believe that the language that is found on page 22 that says, shall reapportion, relates to after there's a new consensus, excuse me, census, if there are changes, then you can reapportion and the city shall reapportion. That is not what the consent decree provides. It provides, and I would submit respectfully as clear a terms as is plausible, you will implement, you shall, shall, there's no discretion, the city shall implement the boundaries, that's on page 22 of the consent decree, Judge. The city shall implement the I mean, just to cut to the chase, the city does draw a new map, and the court finds, despite, as I said, this failure to hit the 10% mark, the 12.65 deviation, but he finds that it's a product of Chicago Heights's good-faith effort to comply with the mandated one-person, one-vote. He talks a little bit about the 12.65% deviation. He's taken evidence on it. He thinks the and so on and so forth, so he approves the new map, July 27th. That's correct, Judge. So we're here to see whether that was wrong. I mean, we're really not here to draw a map. Well, we're not here to draw a map. I agree with that, Judge, which gets us back to the initial question that you asked, where did he go wrong? First off, he went wrong in saying that we're not going to even consider the map proposed by the plaintiffs in this case, which that's not how litigation... Didn't he allow you to and use it as a way of illustrating that there might have been a better approach? He very well may have, Judge. I think he did. The answer to that is yes, he did. Well, I wasn't there. I would assume he did. I'm sorry. I think that matters. You said that he didn't want you to talk about the fact of a better plan at all, and I think it was a limited use. His feeling was that institutionally, the drawing of this case, Chicago Heights, and that strikes me as something that's well established, because a consent decree doesn't say unambiguously that it's the joint job of the parties to the consent decree to do this. I agree with you on the point with respect to the cross-examination, Judge, but the consent decree does say the parties. It doesn't say the city. Even taking... In the different part that you just read to me, it says the city. Well, no, no, no. That's my point, Judge. Page 22, it says the city shall. That's only with respect to that you shall reapportion what we've agreed upon. Now, if things change later, if the numbers, as you articulated, if the numbers change, people move, then that's page 25. That's governed by page 25, and page 25 says, if that happens, then the parties. Now, that's what we're talking about. If things change, if there's a shift in the numbers, the parties shall, and that makes it fairly undebatable that the plaintiffs then have a seat at the table. Here's what we're talking about. 30,000 residents. Yeah, no, we know what the numbers are. 30,000 residents, 7,000 residents of which are white, 12,000 of which are black, and I'm rounding down in each case, 10,000 of which are Hispanic, seven wards. Now, in the first ward, 80 percent, 80 percent of the first ward. Okay, you're going to run short on time, but yes, I mean, we have the numbers of how this breaks down, and I realize it's your view that three wards that are majority white is at least one ward too many. Well, it's at least, precisely, at least one ward too many, and it is a product of violation of the Voting Rights Act, because what it's done, when you pack all of the people of color into two wards, predominantly in two wards, and when you take from the fifth ward, to take from a predominantly white ward in the fifth ward, to put those individuals in the sixth ward, so that the numbers in the voting... Yeah, that's what tips it, your view is, from the majority black to a very thin majority white. Well, respectfully, it's not really my view. Those are the facts. Now, my view might be, I mean, it's my view on why that happened, but factually that's what's happened, and factually, that's what we have to contend with when we are determining whether it reaches constitutional muster or in violation, and I see that... All right, you can save a little bit of time. All right, thank you, Judge. Mr. Zimmer. Good morning. May it please the Court, Austin Zimmer on behalf of the District Court. The first important thing to note is the standard of review for this court. This is a consent decree. This is the District Court's judge's interpretation of a consent decree, and this court has repeatedly said that they will give a great deal of deference to the District Court's decision when interpreting a consent decree, and here, the only issues properly before this court is whether the District Court abused its discretion in determining that the city's proposed map was constitutionally valid and compliant with the consent decree. Starting with the consent decree, it's important to note that the map at issue in this case was formed and created as a result of decades of litigation when a consent decree was entered into. The decree approved a seven-district form of government. That consent decree, though, at page 22 and page 25, did contemplate that in 2010, the census data was going to come out and that the map would have to be reapportioned. The language in there on page 22 states the defendant shall reapportion. I understand at page 25 it does say the parties. Nowhere in the consent decree does it say anywhere that the plaintiffs have a right to create their own map. Why not? I mean, it seems to me it's such a foolish way to handle this litigation. I mean, the plaintiffs are showing that it's possible to create than the one the city was looking at. And the city didn't really even seem to be looking at the fact that, you know, it's the deviation from the smallest to the largest district that matters. It's not like you get a freebie of 10% and then you can add on up to more. And this map does seem to be a map that, you know, the system of the way voting rights cases go, they wind up with three wards, even though their population is nowhere near three-sevenths of the city. That is correct, Your Honor. I guess to answer your question, why is the consent decree written that way? Well, that's what the parties agreed on. And also, I think typically because reapportioning voting wards is typically the job... No, I'm agreeing with you that maybe the basic question before us is, is this map... I mean, so there are two issues. One, was it created in a procedurally flawed manner by not giving the consent decree plaintiffs enough of a seat at the table? Maybe yes, maybe no. You know, that's an issue, procedurally flawed manner. Secondly, I understand them to be saying, these are just bad maps. They violate the Voting Rights Act. And here's why. There's no requirement that there has to be a certain number of majority-minority districts. That's not before this court at this point, and that wasn't before the Judge Gettleman as well. What is a requirement, though, is, you know, the 10 percent, that's the number, and it was over 10 percent. It's 12.6 percent. But how Judge Gettleman handled this, I think, shows that, one, it was consistent with the consent decree, but also consistent under the Constitution. He had his extensive briefing on this issue, and he did find that our map exceeded the 10 percent. So then he required us to submit justification for that going over the 10 percent, to show we didn't violate the Voting Rights Act. We submitted a brief. The brief wasn't just sufficient for him, so he asked to have a hearing. And at that hearing, we set forth evidence, and I think it justified that why this map did not violate the Voting Rights Act. Is this the summer testimony you're talking about? Yes, Your Honor. Yeah. I think it's important to note that the deviation was 26 percent. That deviation of 26 percent came not as a map that the City created, but as a map that was created as a result of the consent decree. And when the census data came out, the City went about, how do we reduce it down from 26 percent? We reduced it down from 26 percent to 12.6 percent, and when you look at the factors that we used, the were not discriminatory, and they were factors that helped with promoting legitimate governmental objections. Was the City using one of those computer programs that draw districts that we see in a lot of voting rights cases? Or was it just sort of, let's move this street here and make it a little more compact? Well, here's what the City, they started with the map that was the consent decree, and that was our number one objective. We wanted to maintain the districts of the consent decree. Then we used a cartographer, and then we moved, really the movements were very slight, and they did it all with the City working with the cartographer, and then they had the data all verified. So in other words, no, you weren't trying to use a computer program to do this. You just looked at the 2010 consent decree map, fiddled around with the boundaries, and came up with the 2014 map. Correct, and the changes that were made, Your Honor, they were very, very minor, and they were done so to reduce the variance as much as possible, but more importantly, to fulfill our legitimate objectives that were presented to Judge Gettleman, and that Judge Gettleman found were done in good faith, and were appropriate, and allowed the map to be found to be constitutional. They were first to comply with the consent decree, maintain the seven ward system, and then also to change the configuration of the existing wards as little as possible. I mean, the changes that we made were very, very slight. Why? Because we wanted to comply with the consent decree, and also wanted to respect historical natural boundary lines, and the movements were very small. It was moving a couple blocks over in a couple wards, and now we have more natural boundaries. Halstead Road is one, Chicago Avenue. So the districts are much more contiguous than they used to be, and that increased the ward compactfulness. So all in all, I mean, the court properly found that we complied with the mandate of one person, one vote. This wasn't a case where there was a 20% or 30% or 40% deviation. It was very, very minor. It's consistent with other cases where they found, you know, minor deviations of 16% to be constitutional. Therefore, I think it's very important that since this is a consent decree, and interpretation of a consent decree, Judge Gettleman did not abuse his discretion. They didn't cite to any cases in their brief that shows he abused his discretion. They had an opportunity at the hearing to present witnesses, to present evidence. They didn't present any evidence at all at the hearing. The only witnesses was the witness that the city put forward. So I think when you look at everything that Judge Gettleman was presented through the pre and the post briefs, and at the evidentiary hearing, it's clearly that his decision was within his discretion. It's clearly his decision was within a You could review for me what role the plaintiffs did have. They were told he wasn't going to sit there and just decide, I like the plaintiff's map versus the city's map. He understood the consent decree, or perhaps maybe just the underlying law, to say it's primarily the city's responsibility to perform this function, or the Chicago Heights Election Commission, or the body the city entrusted to. But they did present, did they not, in some form before the district judge a proposed plan? Yes, Your Honor. They filed a motion to essentially submit their own map and have their own map be approved. And it was attached to that motion? Correct. And Judge Gettleman, his ruling was, based on the consent decree, his discretion, he found that this plaintiffs have no right to submit their own map. And that's based on the plain language of the consent decree. It does say defendants shall reapportion. Nowhere does it say plaintiffs. It does say parties, but to the extent... Why doesn't at least the existence of their map show that there would be a way of drawing the seven wards that would more closely balance the the populations in the city? Well, because under the consent decree... It's this Ward 6 that everybody seems to be The way it's drawn has just, yeah, this North End Ward. 1,429 whites, 1,303 blacks, 413 Hispanics. So with that closely balanced white-black, if you had flipped Ward 6, you would have had three black wards and two white wards. You could have, I guess, to answer your question, Judge, he didn't have to do it because nowhere in the consent decree is he required to do it. He has the discretion to interpret the consent decree in the manner that he sees fit and appropriate. And based on the plain language of the consent decree, there's nowhere in there that says plaintiff has the right to create their own map. Further, federal law does not require the creation of majority-minority districts. So he did not abuse the discretion by not allowing them to present their own maps. So that's... Instead, he found it was the city's sole... Yeah, I'm just saying it's not so much that he had to adopt their map. I'll... Let's all assume we agree with that. It's how do you go about the job of saying that the city's map hasn't complied adequately with the Voting Rights Act? Well, one way you could do it is saying, oh, for example, here's another map that would comply. Maybe there are other ways you could do it. I don't know. And then I think you're right, but then you go back to the... Our deviation was 12.6%. It wasn't under 10%. It was slightly over. So then you have to look at the reasons for that. But remember, the 10% is smallest to largest. It's not, you know, that you've got to... It's not a... It's not just anything can be over 10%. Correct. I think so what... How do we know what our map was appropriate? Could it have been lower? It could have been, but our goal was not to... The city's goal was not to reduce the variance as little as possible. Its goal was to comply with the consent decree. And the goal was to respect the natural boundaries, the historical boundaries, and that was the city's goal. And then the judge found that was within our discretion. It was proper under the existing case law that allows, you know, deviations over 10%. Mm-hmm. Any further questions? I see none, so thank you. Thank you for your time. Anything further, Mr. Jackson? Oh, yes. You know, may I know how much time I have? Three minutes? Judge... Judge Gettleman misinterpreted the consent decree. The consent decree required the city to first reapportion consistent with the agreed-upon boundaries. They never did that, thus they're in violation of the consent decree, which makes... Gives the plaintiffs the right to hold it voidable. They language that I... I hate to read this to you, but... On page 22, assuming the referendum is passed in the gubernatorial general election on November 2nd, 2010, changing the election of Chicago Heights Council, and it goes on, the final map of the automatic district boundaries submitted by the parties as Exhibit B, and the corresponding final mets and bounds of the seven automatic districts submitted by the parties at Exhibit C are hereby approved. That was no room for changing. It goes on, Judge, further down, it says thereafter, after the special elections, the defendants shall reapportion consistent with B and C. They were supposed to do that. That's the only application of the shall apportion. We agreed on these boundaries, you shall apportion them. Now, after the election, after the publication of the 2000 census, this is on page 25, the parties will, with reasonable dispatch, reapportion the voting right... the voting districts. The consent decree has two operative visions here on the appeal, for matters of appeal. One is, first, you shall apportion, reapportion consistent with what we've agreed upon. They never did that. And secondly, if there are changes consistent with the... there are changes from the consensus... the census of 2010 that warrant additional changes, that's what we're talking about, additional changes, then the parties shall. The reason, Your Honor, we're not allowed, given the onus or the responsibility, the opportunity to submit the initial map, is because that becomes the foundation from which you then operate. The judge was locked into the provisions of what the city proposed. What the city proposed, Judge, violates the Voting Rights Act. The numbers, the results in exactly what the Supreme Court and our legislators were trying to prevent. You have a city where 7,000 residents effectively control 30,000. The Voting Rights Act is supposed to not let that happen. And we keep hearing this talk about 10% and the 10%... Oh, I'm sorry. Yeah, you need to wrap up now. Alright, sorry, Judge. 10% is de minimis. Our objective is supposed to be absolute, not 10%. Thank you, Your Honor. Okay, thank you very much. Thanks to both counsel. We'll take the case under advisement. All right.